```
 1                      UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3      ------------------------------X
        UNITED STATES OF AMERICA,     :  Case No. 1:19-cr-00197
 4                                    :  Cleveland, Ohio
                   Plaintiff,         :
 5                                    :
             v.                       :  Thursday,
 6                                    :  September 19, 2019
        LAVAR PARKS,                  :  10:13 a.m.
 7                                    :
                   Defendant.         :
 8      ------------------------------X

 9

10          TRANSCRIPT OF SUPPRESSION HEARING PROCEEDINGS

11          BEFORE THE HONORABLE CHRISTOPHER A. BOYKO

12                  UNITED STATES DISTRICT JUDGE

13

14      Court Reporter:           Donnalee Cotone, RMR, CRR, CRC
                                  Realtime Systems Administrator
15                                United States District Court
                                  801 West Superior Avenue
16                                Court Reporters 7-189
                                  Cleveland, Ohio 44113
17                                216-357-7078
                                  donnalee_cotone@ohnd.uscourts.gov
18

19

20

21

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.
```

```
 1     APPEARANCES:

 2

 3     For the Government:      KELLY L. GALVIN

 4                             Assistant United States Attorney

 5                             801 West Superior Avenue

 6                             Suite 400

 7                             Cleveland, Ohio 44113

 8                             216-622-3600

 9                             kelly.l.galvin@usdoj.gov

10

11     For the Defendant:      CAROLYN M. KUCHARSKI

12                             Assistant Federal Public Defender

13                             Office of the Federal Public Defender

14                             1660 West 2nd Street, Suite 750

15                             Cleveland, Ohio 44113-1454

16                             216-522-4856

17                             carolyn_kucharski@fd.org

18

19

20

21

22

23

24

25
```

1                                    **I N D E X**

2                                                                    **PAGE**

3

        APPEARANCES........................................   2
4

5

6

7       DIRECT EXAMINATION OF TREVOR MAJID.................   5
        BY MS. GALVIN
8

        CROSS-EXAMINATION OF TREVOR MAJID..................  23
9       BY MS. KUCHARSKI

10      REDIRECT EXAMINATION OF TREVOR MAJID...............  45
        BY MS. GALVIN
11

        RECROSS-EXAMINATION OF TREVOR MAJID................  48
12      BY MS. KUCHARSKI

13      FURTHER RECROSS-EXAMINATION OF TREVOR MAJID........  51
        BY MS. KUCHARSKI
14

15

16

17

18

19      REPORTER CERTIFICATE...............................  63

20

21

22

23

24

25

4

1          MORNING SESSION, THURSDAY, SEPTEMBER 19, 2019

2              (Proceedings commenced at 10:13 a.m.)

3                          - - -

4              DEPUTY CLERK:  Your Honor, the case before the

10:18:42  5   Court carries Case Number 1:19-cr-197, *United States of*

6   *America v. Lavar Parks*.

7              THE COURT:  Mr. Parks, you are present?

8        You are present?

9              THE DEFENDANT:  Yes, sir.

10:18:51 10             THE COURT:  Okay.  Ms. Carolyn Kucharski is

11   here representing you.

12             MS. KUCHARSKI:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14        Ms. Kelly Galvin on behalf of the Government.

10:18:59 15        We're here on a motion to suppress filed by the

16   defense.  The Court finds there's sufficient facts alleged

17   to go forward.

18        Ms. Galvin, are you ready?

19             MS. GALVIN:  Yes, Your Honor, I am.

10:19:09 20             THE COURT:  Please call your first witness.

21             MS. GALVIN:  Thank you, Your Honor.

22        The Government would call Officer Trevor Majid.

23             THE COURT:  Please have a seat.

24        Please swear him in.

10:19:45 25                  (Witness sworn.)

1          MS. GALVIN:  Your Honor, with the Court's

2    permission, may I proceed from here where my equipment is

3    set up?

4          THE COURT:  Sure.

10:20:00  5          MS. GALVIN:  Thank you very much, Your Honor.

6    Donnalee, are you good with the . . .

7          THE REPORTER:  Yes.

8          MS. GALVIN:  Thank you.

9          DIRECT EXAMINATION OF TREVOR MAJID

10:20:06  10   BY MS. GALVIN:

11   Q.    Sir, could you please tell us your name and spell your

12   last name for the record.

13   A.    Officer Trevor Majid, M-A-J-I-D.  Badge 777.

14   Q.    And where are you employed?

10:20:17  15   A.    City of Cleveland.

16   Q.    How long have you worked for the City of Cleveland?

17   A.    A little over five years.

18   Q.    And in what capacity do you work for the city?

19   A.    Patrol officer.

10:20:27  20   Q.    Have you been a patrol officer the entire five years?

21   A.    Yes.

22   Q.    Is there a primary area or district that you have

23   patrolled in those five years?

24   A.    Yes.  Second district.

10:20:39  25   Q.    Do you recall if you were working back on

1   February 5th, 2019?

2   A.    Yes.  Yes, I was.

3   Q.    Could you tell us what shift you were working?

4   A.    I was on the second shift -- it's called B platoon --

10:20:50  5   from 3:00 p.m. to 1:00 a.m.

6   Q.    And did you have a partner on that day?

7   A.    I did.

8   Q.    And who was your partner?

9   A.    At the time he was PPO Smith, Badge 2352, I believe.

10:21:02  10   Q.    And by "PPO," is that someone who is on a probationary

11   period?

12   A.    That is correct.

13   Q.    So were you training him essentially at this time as

14   well?

10:21:10  15   A.    I was.

16   Q.    And as patrol officers, would you both have been in

17   patrol uniforms much like what you're wearing there today?

18   A.    That's correct.

19   Q.    And were you in a marked cruiser?

10:21:21  20   A.    I was.

21   Q.    Okay.  Around 3:10 or so that afternoon, could you

22   please tell us generally what area were you patrolling?

23   A.    We were in the area of Denison Avenue and West 47th

24   Street.

10:21:31  25   Q.    And did you have any specific assignments that day

1    other than basic patrol?

2    A.    We were in a high crime neighborhood.  We were looking

3    for stolen vehicles.

4    Q.    And when you say we were looking for them, why were

10:21:43 5    you looking for them?

6    A.    Just a lot of stolen vehicles had been recovered and

7    had been observed driving through those neighborhoods.

8    Q.    And have you personally made arrests for receiving

9    stolen property or grand theft of motor vehicles, let's say

10:21:58 10    in the month leading up to February 5th, 2019?

11    A.    Yes, I have.

12    Q.    All right.  What are you looking for when you're

13    looking for stolen vehicles?

14    A.    Just probably a nicer vehicle.  I mean, it's just

10:22:08 15    something that kind of sticks out to us.  It's just by

16    experience, just, you know, kind of being visible on the

17    side streets and looking at cars that are passing by.

18    Q.    Okay.  And when you say nicer vehicles, do you mean

19    sort of like expensive makes and models of cars?

10:22:25 20    A.    That's correct.

21    Q.    All right.  Around 3:10 or so that afternoon, did you

22    see a red Audi?

23    A.    I did.

24    Q.    And can you tell us approximately where you were when

10:22:34 25    you saw this Audi?

**Majid (Direct by Galvin)**

8

1    A.    We were -- the Audi was traveling eastbound on Denison

2    Avenue.  At this point, we exited one of the side streets,

3    and then we did get behind this Audi.

4    Q.    And do you know what type of car it was?  You said an

10:22:49  5    Audi.

6          Do you recall more specifically what type of model it

7    was?

8    A.    I do not, no.  Not --

9    Q.    What about it drew your attention?

10:22:59 10    A.    It was a bright red car.

11    Q.    Now, as you see the vehicle, what do you naturally

12    look at when you're looking at stolen vehicles?

13    A.    The license plate.

14    Q.    And can you tell us what you saw when you saw the

10:23:10 15    license plate?

16    A.    It had a cover over the license plate, and it was very

17    hard to read.  The cover was tinted and it also had a bunch

18    of salt that was built up behind the plate making the plate

19    blurry and almost hard to read.

10:23:25 20    Q.    If you can, approximately how far away were you from

21    the vehicle at the time that you first see this license

22    plate?

23    A.    I was probably a couple of car lengths originally, and

24    then after I realized I couldn't see it, I had to get almost

10:23:39 25    up to its bumper.  Like almost -- my bumper to his rear

**Majid (Direct by Galvin)**

9

1    bumper to actually visibly see the plate.

2    Q.    So from a couple of car lengths away, let's define

3    what you could see.

4          Could you tell that there was, in fact, a license

5    plate?

6    A.    Yes.

7    Q.    Okay.  Could you read any numbers or letters on the

8    plate?

9    A.    From the couple car lengths away, no.

10   Q.    All right.  Yeah.  Let's talk specifically when you

11   initially see this plate what you're able to see.

12         So you cannot tell -- can you tell if they're letters

13   or numbers?

14   A.    I can't tell anything, no.

15   Q.    Can you tell if there is a validation sticker on the

16   plate as well?

17   A.    No.

18   Q.    And this is all from a couple of car lengths away?

19   A.    Correct.

20   Q.    Okay.  Officer, are you equipped with dash cameras in

21   your vehicles?

22   A.    We are not.

23   Q.    Are you equipped with body cameras?

24   A.    We are.

25   Q.    Could you please explain to us the circumstances under

**Majid (Direct by Galvin)**

10

| | |
|---|---|
| 1 | which you activate your body cameras? |
| 2 | A.   We activate our body cameras before we have any kind |
| 3 | of contact with a citizen.  It is a 30-second buffer before |
| 4 | that, so it records 30 seconds before we actually turn on |
| 10:24:45  5 | our camera before the audio kicks on. |
| 6 | Q.   All right.  Now, are you generally driving around |
| 7 | while you're on patrol with your body cameras on at all |
| 8 | times? |
| 9 | A.   No. |
| 10:24:54 10 | Q.   And why not? |
| 11 | A.   It's just because it's not -- it's not citizen |
| 12 | contact, and just a waste of storage space. |
| 13 | Q.   Okay.  And is storage space quite honestly an issue |
| 14 | with you for your body cams? |
| 10:25:05 15 | A.   Yes. |
| 16 | Q.   Okay.  So this initial encounter that you're just |
| 17 | describing with seeing the vehicle and the license plate |
| 18 | that you cannot read, is this recorded in any fashion on |
| 19 | your body camera? |
| 10:25:16 20 | A.   Can you repeat the question.  I'm sorry. |
| 21 | Q.   Sure. |
| 22 | When you initially see this vehicle, but you cannot |
| 23 | read the plate, was your body camera on? |
| 24 | A.   No. |
| 10:25:24 25 | Q.   And is it because you are not currently in an |

**Majid (Direct by Galvin)**

11

1    encounter or in pursuant of anyone?

2    A.    That's correct.

3    Q.    All right.  At some point in time are your body

4    cameras as well as Officer Smith's body cameras turned on?

10:25:37  5    A.    Yes, it does.

6    Q.    All right.  Now, how long did you follow this vehicle?

7    A.    I'd say maybe between 30 seconds to a minute.  I don't

8    recall exactly the time frame, but . . .

9    Q.    Is it a relatively short period of time?

10:25:54 10    A.    Yes.

11    Q.    Now, did something happen that enabled you to now be

12    right behind that car, meaning there's no cars separating

13    you?

14    A.    The only thing that was stopping me -- can you -- I'm

10:26:07 15    sorry.  Can you repeat the question again.

16    Q.    Sure.  Absolutely.

17          You mentioned that you were a couple of car lengths

18    behind the vehicle initially.

19    A.    Correct.

10:26:16 20    Q.    Does that mean that there were other cars in front of

21    you?

22    A.    Yes.  Yes.

23    Q.    All right.  And at some point in time are there no

24    longer any other cars in front of you besides this red Audi?

10:26:25 25    A.    Yes.

```
 1    Q.    And is that about the 30 seconds to one minute that

 2    you're discussing?

 3    A.    Yes.  Yep.

 4    Q.    All right.  Please tell us how you were finally able

 5    to see this license plate.

 6    A.    After the couple of cars that were in front

 7    of -- between me and the red Audi turned down -- I think

 8    they just turned on down some side streets, -- I was able to

 9    get right behind the Audi at this point, and we were stopped

10    at a red light.  And then from the red light, I got right up

11    to the bumper, and I was able to somewhat make out the plate

12    and enter it into my computer system, my MDT it's called.

13    Q.    Okay.  So who was driving and who is sitting in the

14    passenger seat?

15    A.    I was driving that day and my -- PPO Smith was in the

16    passenger seat.

17    Q.    All right.  So do you recall which one of you was able

18    to read the license plate to be able to enter it into your

19    MDT, your mobile data terminal?

20    A.    I was the one that was able to make out the plate.

21    Q.    All right.  From what distance were you at this point

22    that you're finally able to read the plate?

23    A.    At this point we were -- I was bumper to bumper with

24    him.  I had to get very, very close up to his bumper to see

25    it.
```

**Majid (Direct by Galvin)**

13

1    Q.    So basically the distance from the hood of your car to

2    his bumper?

3    A.    Correct.

4    Q.    And would you describe that as less than 10 feet?

10:27:35  5    A.    Yes.

6    Q.    Okay.

7    A.    Absolutely.

8    Q.    Were you able to see the validation sticker?

9    A.    No.

10:27:42 10    Q.    Is it at this point in time that you begin trying to

11    determine through your mobile data terminal information

12    about the vehicle itself?

13    A.    Correct.

14    Q.    And is this the portion which is now captured on your

10:27:55 15    body cam?

16    A.    Yes, it is.

17            MS. GALVIN:  Your Honor, with the Court's

18    permission, may we begin playing Government's Exhibit 1?

19            THE COURT:  Go right ahead.

10:28:05 20            MS. GALVIN:  Thank you, Your Honor.

21    BY MS. GALVIN:

22    Q.    Now, Officer, I believe you've already mentioned to

23    us, about the first 30 seconds we will see video but no

24    audio; is that correct?

10:28:17 25    A.    That's correct.

**Majid (Direct by Galvin)**

14

1    Q.    And that's due to a buffering system within the

2    cameras?

3    A.    That's correct.

4    Q.    You have no control over that?

10:28:24  5    A.    That's correct.

6                    (Video played in open court.)

7    Q.    Okay.  So, Officer, since there is no sound, is what

8    we see to the right of this screen the other officer pulling

9    up information in this terminal?

10:28:36  10    A.    That is correct.

11                    (Video played in open court.)

12    Q.    All right.  Officer, I have stopped the video at

13    33 seconds.

14          Can you tell us exactly what this location is here?

10:29:06  15    We seem to be on a bridge.  Could you tell us where are we

16    are?

17    A.    This is just -- we're on Denison Avenue.  We're just

18    East of West 47th Street.

19    Q.    How did you stop the vehicle?  In other words, how did

10:29:16  20    you pull it over?

21    A.    We initiated our overhead lights and sirens.

22    Q.    Now, from where you are right now to the vehicle, can

23    you tell us approximately how many feet you are away?

24    A.    Probably between -- probably between 3 and 5.

10:29:34  25    Q.    All right.  And as you look at the license plate

**Majid (Direct by Galvin)**

15

1    there, are you able to read it?

2    A.    No.

3    Q.    Now, when you initially saw the car and began your

4    process of reviewing the plate, did it appear that the

10:29:48  5    registered owner was a female?

6    A.    Yes.

7    Q.    Could you tell as the vehicle was in motion whether or

8    not it was a male or a female driving the car?

9    A.    When the vehicle was in motion?

10:30:02  10    Q.    Yes.

11    A.    It was hard to tell who was driving the vehicle.

12    Q.    And were you able to tell if there was more than one

13    occupant?

14    A.    I knew it was one occupant, yes.

10:30:14  15    Q.    But you weren't able to tell if it was a male or a

16    female?

17    A.    That's correct.

18    Q.    All right.  Officer, I'm going to resume the video.

19            (Video played in open court.)

10:30:28  20    BY MS. KUCHARSKI:

21    Q.    Officer, let me stop there.

22            You mentioned before that the plate itself seemed to

23    have some salt residue and buildup.

24            What was the overall condition of rest of the car?

10:30:39  25    A.    It was clean.  It was like it just had a car wash.

1                    (Video played in open court.)

2      BY MS. GALVIN:

3      Q.    All right.  Officer, you've asked him some initial

4      questions; is that correct?

10:31:13   5      A.    That's correct.

6      Q.    Are these rather standard questions for you, driver's

7      license, insurance?

8      A.    That's correct, yes.

9      Q.    How about whose vehicle is this?

10:31:21  10      A.    That's correct.

11      Q.    All right.  Were there other things that you noticed

12      with your initial encounter with him?

13      A.    Just -- I mean, no.  Just the odor -- I mean, as I'm

14      talking to him, I have the odor of marijuana smell as I was

10:31:40  15      talking to him, and I asked him about that.

16      Q.    All right.  Does it -- it appears in the video that he

17      might be smoking a cigarette; is that correct?

18      A.    That's correct.

19      Q.    And is there something you've encountered before with

10:31:50  20      individuals who have also used marijuana?

21      A.    That is correct, yes.

22      Q.    And what's the purpose of that in your training and

23      experience?

24      A.    Just to cover up the scent in the vehicle.

10:32:01  25                    (Video played in open court.)

          1   BY MS. GALVIN:

          2   Q.    Now, Officer, I just stopped it at the 1 minute and 9

          3   second mark.

          4         You asked him if there was anything illegal in the

10:32:14  5   car.  Is that because of the smell of marijuana?

          6   A.    That is correct.

          7                   (Video played in open court.)

          8   BY MS. GALVIN:

          9   Q.    Officer, did he admit to you to actually using

10:32:31 10   marijuana?

         11   A.    He did.

         12   Q.    Now, at that point in time, what do you ask him to do?

         13   A.    I just asked him to step out of the vehicle.

         14   Q.    And why would you ask him to step out of the vehicle

10:32:45 15   with the marijuana?

         16   A.    I mean, he admitted to smoking marijuana.  He's now

         17   admitted to me he's under the influence of marijuana, and

         18   due to the odor, I just had him step out.

         19   Q.    What was your intent of pulling him out of the

10:33:02 20   vehicle?

         21   A.    At this point we were just going to pat him down for

         22   weapons because now he told me he did, you know, smoke

         23   marijuana, and, you know, just for our safety just pat him

         24   down for weapons now at this point.

10:33:11 25   Q.    And in your training and experience, is there any

1   connection between people who are under the influence of

2   drugs and firearms?

3   A.    Yes.

4   Q.    And what is that?

10:33:19 5   A.    It could be an officer safety issue.  I mean, it could

6   be if they're under the influence of some kind of narcotic

7   and they have a firearm on them, it could be an issue with

8   us, so at this point we want to at least pat him down and

9   make sure he didn't have anything on him.

10:33:35 10   Q.    Have you, yourself, made arrests in the past of people

11   who were under the influence or in possession of drugs who

12   also had firearms?

13   A.    Yes.

14   Q.    At that point in time based on the smell of marijuana,

10:33:46 15   were you going to conduct any search of the vehicle as well?

16   A.    Yes.

17   Q.    What would you normally do if you're going to search a

18   vehicle?

19   A.    You remove the occupants, pat them down, secure them

10:33:58 20   in the back seat of our police car.

21   Q.    Would that be another reason why you would have also

22   conducted the pat down?

23   A.    Yes.

24                    (Video played in open court.)

10:34:46 25   BY MS. GALVIN:

**Majid (Direct by Galvin)**

19

1  Q.    Okay.  Officer, a lot just happened here in about 15

2  seconds or so.

3        So please tell us what happens.  You inform him that

4  you're going to have him step out of the car; is that

10:34:59  5  correct?

6  A.    Correct.

7  Q.    And that was for the purpose of performing the pat

8  down?

9  A.    That is correct.

10:35:04 10  Q.    Before you are even able to do that, what happens?

11  A.    I asked him a question, and he admitted to

12  having -- he didn't directly answer my question, but then he

13  admitted to having a firearm on him, a pistol.

14  Q.    Can you tell us how his demeanor is at this moment in

10:35:19 15  time?  So I'm going to call it about a minute to 30 seconds

16  to 45 seconds into the video.

17        Is there any difference between this and his initial

18  demeanor towards you?

19  A.    Just being nervous, I guess.  He's not -- you know, he

10:35:34 20  was -- he had his phone out.  The whole smoking the

21  cigarette.  He just -- you know, he had that nervous feeling

22  on him and whatnot, so . . .

23  Q.    When you ask a suspect if they have a firearm on you

24  and they don't immediately answer, does that cause you any

10:35:48 25  concern?

**Majid (Direct by Galvin)**

20

1    A.    Yes.

2    Q.    Okay.  Was there anything else about his actions that

3    led you to believe before he even admitted he had the

4    firearm that he might have one?

10:35:59  5    A.    No.

6    Q.    Now, he did admit to you that he had a firearm; is

7    that correct?

8    A.    That's correct.

9    Q.    Okay.  And was he able to tell you where it was?

10:36:12  10    A.    That's -- yes.

11    Q.    And where did he say?

12    A.    I think he -- I believe he said he just put it on him,

13    that it was underneath the seat.

14    Q.    So from your understanding, where -- according to him,

10:36:23  15    where had the firearm been?

16    A.    He said it was underneath his -- he said it was

17    underneath the seat.

18    Q.    And then where did he put it according to his

19    statement?

10:36:33  20    A.    He said, on him, so . . .

21    Q.    And at this moment in time, do you know what "on him"

22    means?

23    A.    No.  No.

24                        (Video played in open court.)

10:39:04  25    BY MS. GALVIN:

**Majid (Direct by Galvin)**

21

1    Q.    All right.  Officer, I have stopped at the four-minute

2    mark into your body camera.

3                    MS. GALVIN:  Ms. Kucharski, is that

4    sufficient?

10:39:12  5                    MS. KUCHARSKI:  Yeah.  I mean, I have mine as

6    well, so . . .

7                    MS. GALVIN:  Thank you.

8    BY MS. GALVIN:

9    Q.    Now, Officer, once he was searched, was a firearm

10:39:19 10  actually found on his person?

11   A.    Yes.

12   Q.    And where was it found?

13   A.    I believe it was in his right -- it was in a holster

14   on his right side.

10:39:27 15  Q.    And is this an exterior or interior holster?

16   A.    It was -- I don't recall exactly what kind of holster

17   it was.

18   Q.    But was the firearm found inside his pants or outside

19   his pants?

10:39:42 20  A.    Inside his pants.  Uh-huh.

21   Q.    I'm sorry.  That was a poorly worded question on my

22   part, exterior/interior.

23   A.    Sorry.

24   Q.    But it was found inside his pants?

10:39:52 25  A.    That is correct.

1    Q.    But in a holster?

2    A.    Correct.

3              MS. GALVIN:  Your Honor, could I have a

4    moment?

5              (Pause in proceedings.)

6              MS. GALVIN:  Your Honor, it is my

7    understanding that Ms. Kucharski is not contesting any

8    statements made by the defendant, so I will probably be

9    stopping my direct examination at this time.

10         Is that correct?

11              THE COURT:  Ms. Kucharski?

12              MS. KUCHARSKI:  That is correct, Your Honor.

13              THE COURT:  Okay.  Anything else, Ms. Galvin?

14              MS. GALVIN:  No, Your Honor.  I have no

15   further questions.

16              THE COURT:  Ms. Kucharski, cross.

17              MS. KUCHARSKI:  Thank you, Your Honor.

18         Your Honor, may I approach the witness, because I have

19   some exhibits that I'm going to be referring to, and I have

20   a copy for the Court as well, and I provided a copy for the

21   Government.

22              THE COURT:  Sure.  Go ahead.

23              MS. KUCHARSKI:  Thank you, Your Honor.

24

25

CROSS-EXAMINATION OF TREVOR MAJID

BY MS. KUCHARSKI:

Q.    Officer Majid, you said that you've been with the City
of Cleveland for five years?

A.    That is correct.

Q.    And were you with law enforcement prior to your job
with the City of Cleveland?

A.    No, I was not.

Q.    Okay.  So this was your first law enforcement job,
correct?

A.    That is correct.

Q.    And you said that over the course of the five years,
you've been assigned to patrol?

A.    That is correct.

Q.    And can you explain to the Court what the duties are
of a patrol officer?

A.    Patrol officer is in a marked police vehicle.  They
respond to any emergency or nonemergency calls, as well as
proactive of policing, enforcing traffic laws, enforcing any
kind of laws basically.

Q.    Okay.  So would you say that a good part of the last
five years have been spent enforcing traffic laws?

A.    That is -- yep, that's correct.

Q.    All right.  And the City of Cleveland, you're familiar
with their traffic ordinances, correct?

1    A.    That is correct, yes.

2    Q.    And I'm going to refer you to Defense Exhibit D.  And

3    it's a two-page document.  And really, the pertinent part is

4    the second page of that document.

10:42:54  5         Do you see that?

6    A.    I do.

7    Q.    And that's the City of Cleveland Ordinance 435.10,

8    license plates to be unobstructed, correct?

9    A.    That is correct.

10:43:07  10   Q.    And you said that the basis of your stop in this case

11   was an obstructed license plate, correct?

12   A.    That is correct.

13   Q.    And, in fact, you did issue a citation, and that's

14   Defendant's Exhibit E.

10:43:24  15        Do you see that?

16   A.    I do.

17   Q.    And in that citation, you note that the ordinance that

18   you were citing was 435.10, correct?

19   A.    Correct.

10:43:35  20   Q.    And by the way, that wasn't handed to Mr. Parks

21   personally, that was something that was completed after he

22   had already been booked into the county jail, correct?

23   A.    Can you repeat that?

24   Q.    Yes.

10:43:46  25        This ticket that you filled out, it was completed

**Majid (Cross by Kucharski)**

25

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | after he had been booked into the jail.                  |
|          | 2  | Do you know if he was ever served with this ticket?      |
|          | 3  | A.    Yeah, he was.                                       |
|          | 4  | Q.    He was served on the scene with this ticket?       |
| 10:44:03 | 5  | A.    He was -- it was part of the booking paperwork.  The |
|          | 6  | citation was left with the jailer at the county because he |
|          | 7  | was being booked on the ticket as well as all the other  |
|          | 8  | charges.                                                 |
|          | 9  | Q.    Okay.  So you never, in fact, handed him that ticket, |
| 10:44:14 | 10 | it was left with booking?                                |
|          | 11 | A.    He would have received -- no.  He received a pink  |
|          | 12 | copy -- no, because that -- the original copy stays with |
|          | 13 | the -- the white copy stays with the booking staff down at |
|          | 14 | county, and then the defendant's copy is a pink copy of that |
| 10:44:29 | 15 | citation that goes with his property.                    |
|          | 16 | Q.    Okay.  And maybe you didn't understand my question. |
|          | 17 | You did not hand Mr. Parks that ticket, correct?         |
|          | 18 | It was left with booking for booking to hand him the     |
|          | 19 | ticket, correct?                                         |
| 10:44:43 | 20 | A.    No.  The pink copy of the citation was given to    |
|          | 21 | Mr. Parks --                                             |
|          | 22 | Q.    By you?                                            |
|          | 23 | A.    Yes.  In the sally port of the county.  They see the |
|          | 24 | ticket, and the pink copy only goes into his property bag. |
| 10:44:59 | 25 | The white copy stays down at county, and then the green copy |

**Majid (Cross by Kucharski)**

26

1    in the middle goes back with us at the police station.

2    Q.    Okay.  So you handed that to him when he was being

3    booked?

4    A.    Correct.

10:45:09    5    Q.    Okay.  Now, this -- I'm going to refer you back to

6    Exhibit D, and that is Ordinance 435.10.

7          Do you see that?

8    A.    Yes.

9    Q.    And that ordinance states, "No person shall operate a

10:45:24    10    motor vehicle upon which license plates are required by law

11    to be displayed unless the license plates legally registered

12    and issued for such vehicle shall be fastened in such a

13    manner and not covered, obscured or concealed by any part or

14    accessory of such vehicle or by any foreign substance or

10:45:50    15    material to be readable in its entirety from left to right."

16          Do you see that?

17    A.    I do.

18    Q.    Okay.  Now, I want to play for you the beginning of

19    that traffic stop when your body camera goes on.

10:46:08    20    A.    Okay.

21                  (Video played in open court.)

22                  MS. KUCHARSKI:  Okay.  And I want to stop it

23    there.

24    BY MS. KUCHARSKI:

10:46:20    25    Q.    All right.  Do you see that screen?

**Majid (Cross by Kucharski)**

27

```
            1    A.     I do.

            2    Q.     All right.  And I'm going to refer you to Defense

            3    Exhibit B.

            4           And can you see on that screen that it has the name

10:46:37    5    Sondra G. Hemphill?

            6    A.     Yes.

            7    Q.     Okay.  And, in fact, that red Audi was registered to

            8    Sondra Hemphill, correct?

            9    A.     Yes.

10:46:48   10    Q.     And that vehicle was not reported stolen, correct?

           11    A.     That is correct.

           12    Q.     And prior to your shift that day, you didn't receive a

           13    BOLO or a be on the lookout for a red Audi, correct?

           14    A.     Correct.

10:47:06   15    Q.     Okay.

           16              MS. KUCHARSKI:  And if we can play a little

           17    farther.

           18           Okay.  And stop there.

           19              (Video played in open court.)

10:47:13   20    Q.     And if you can refer to Defendant's Exhibit C.

           21           Do you see that?

           22    A.     Mm-hmm.

           23    Q.     And that's a picture of Miss Hemphill, correct?

           24    A.     Correct.

10:47:27   25    Q.     So at this juncture, this is prior to you stopping the
```

Majid (Cross by Kucharski)

1    vehicle, correct?

2    A.    Correct.

3    Q.    So at this point, you were able to enter the full

4    license plate into the MDT unit, correct?

10:47:41 5    A.    Correct.

6    Q.    And that's how you were able to get this information?

7    A.    Correct.

8    Q.    And ultimately, this information regarding the

9    registration of the vehicle was correct.

10:47:59 10    She is the owner of the vehicle?

11    A.    Correct.

12    Q.    She was determined to be the owner of the vehicle?

13    A.    Yeah.  Correct.

14    Q.    Okay.  And the vehicle was properly registered?

10:48:06 15    A.    Correct.

16    Q.    Okay.  Now, I want to play a little further.

17    (Video played in open court.)

18    MS. KUCHARSKI:  Stop it here.

19    BY MS. KUCHARSKI:

10:48:22 20    Q.    And the vehicle starts moving now, correct?

21    A.    Correct.

22    Q.    All right.  So if you can look out the window on this

23    screen, you're not under a traffic light, correct?

24    A.    That's correct.

10:48:35 25    Q.    All right.  So this information that you're gathering

**Majid (Cross by Kucharski)**

29

1    when you're pulling up the license plate for this Audi,

2    you're in a stationary or stopped position at this point in

3    time, correct?

4    A.    Correct.

10:48:52  5    Q.    And we don't see a traffic light, correct?

6    A.    Correct.

7    Q.    All right.  Now, this screen -- are you familiar with

8    this screen?  It says something like Falcon checks M,

9    M-something?

10:49:08  10    A.    Yes.

11    Q.    What does that mean?

12    A.    That's clearing an assignment that was still -- that

13    we -- I think that we -- I think we -- we were clearing an

14    assignment that was still said that we were on the -- it

10:49:20  15    basically said that we were on an assignment previous to

16    this traffic stop, and we had to clear out that screen to

17    show us ready for a traffic stop.

18    Q.    Okay.  And you said that your shift this day started

19    at 3:00, correct?

10:49:34  20    A.    Correct.

21    Q.    And the stop of this vehicle occurred at approximately

22    3:15 p.m.?

23    A.    No.  No.  It --

24    Q.    What time did the stop occur?

10:49:59  25    A.    I don't recall the stop time, but on my citation --

**Majid (Cross by Kucharski)**

30

1   under the citation, it looks like it's 5:10 p.m., I believe.

2   Q.   And this is February, correct?

3   A.   February 5th, it looks like, according to this

4   citation.

10:50:24  5   Q.   Okay.  And so it's -- well, the dash cam should have

6   the time -- or I'm sorry -- the body cam has the time as

7   well, correct?

8   A.   Yes, I believe so.

9   Q.   Okay.  Well, on the top of the screen, it says

10:50:43 10   T22:09:26.

11       Is that an incorrect time then?

12   A.   I mean, I'm not sure, ma'am.  I don't know.

13   It's -- I'm not sure what those numbers even mean, to be

14   honest.

10:50:52 15   Q.   So you don't know what that number means on top of the

16   body cam?

17   A.   No.  I just know the one below it is my actual body

18   camera serial number.  I don't know -- if that is a time,

19   then that's incorrect.  If that is a time, it would be

10:51:07 20   22:09, that means it's 10:09 p.m.

21   Q.   Okay.  All right.

22          MS. KUCHARSKI:  Keep playing the body cam.

23           (Video played in open court.)

24          MS. KUCHARSKI:  Okay.  And stop here.

10:51:13 25   BY MS. KUCHARSKI:

**Majid (Cross by Kucharski)**

31

| | | |
|---|---|---|
| | 1 | Q.    Now, what this screen is displaying? |
| | 2 | A.    That's just a screen of all the pending runs and all |
| | 3 | the assignments that other zone cars are on in our district. |
| | 4 | Q.    All right.  So that doesn't relate to the LEADS run as |
| 10:51:41 | 5 | well? |
| | 6 | A.    No, no, no.  No. |
| | 7 | (Video played in open court.) |
| | 8 | MS. KUCHARSKI:  All right.  Now stop here. |
| | 9 | BY MS. KUCHARSKI: |
| 10:51:45 | 10 | Q.    Now, you can see here we're coming up to a light, |
| | 11 | correct? |
| | 12 | A.    Yes. |
| | 13 | Q.    All right. |
| | 14 | MS. KUCHARSKI:  Keep playing. |
| 10:51:51 | 15 | (Video played in open court.) |
| | 16 | BY MS. KUCHARSKI: |
| | 17 | Q.    And we can presume now -- |
| | 18 | MS. KUCHARSKI:  Stop. |
| | 19 | Q.    -- that you've just pulled over the vehicle, correct? |
| 10:52:02 | 20 | A.    Correct. |
| | 21 | BY MS. KUCHARSKI: |
| | 22 | Q.    Now, when you activated your lights and got behind |
| | 23 | this vehicle, he pulled over safely, correct? |
| | 24 | A.    He did. |
| 10:52:10 | 25 | Q.    He didn't attempt to evade the police? |

            1    A.    No.

            2    Q.    Okay.

            3               MS. KUCHARSKI:  Keep playing.

            4                  (Video played in open court.)

10:52:18    5               MS. KUCHARSKI:  Okay.  Stop here.

            6    BY MS. KUCHARSKI:

            7    Q.    And we've already seen this part of the video before,

            8    but as you're approaching the car, you don't notice him

            9    making any furtive movements or looking in the back or

10:52:37   10    reaching down, correct?

           11    A.    No.  I don't notice that, no.

           12    Q.    Okay.

           13               MS. KUCHARSKI:  And keep playing.

           14                  (Video played in open court.)

10:52:44   15               MS. KUCHARSKI:  And again, stop here.

           16    BY MS. KUCHARSKI:

           17    Q.    Up until this point in time as you're still

           18    approaching the vehicle he still hasn't made any sudden

           19    movements or jerking motions or anything of that nature,

10:52:56   20    correct?

           21    A.    That's correct, yes.

           22    Q.    All right.

           23               MS. KUCHARSKI:  Keep playing.

           24                  (Video played in open court.)

10:53:04   25               MS. KUCHARSKI:  Okay.  I'm going to stop here.

1    BY MS. KUCHARSKI:

2    Q.    Now, up until this point in time, when you come up to

3    the window and you tap on the window, you would agree that

4    it would be important for you as a police officer to be able

10:53:17  5    to see both of his hands, correct?

6    A.    That's correct.

7    Q.    And as you approach the vehicle, you were able to see

8    both of his hands, correct?

9    A.    That's correct.

10:53:25 10    Q.    And, in fact, he had his license and registration, or

11    insurance card -- I'm sorry -- license and insurance card in

12    his hand, correct?

13    A.    Yes, I believe so.

14    Q.    All right.

10:53:36 15                 MS. KUCHARSKI:  Keep playing.

16                    (Video played in open court.)

17                 MS. KUCHARSKI:  All right.  Stop there.

18    BY MS. KUCHARSKI:

19    Q.    At this point in time, you tell him that the plate was

10:53:47 20    hard to read, right?

21    A.    That's correct.

22    Q.    All right.  But you were able to read it before the

23    stop and run all of the information, correct?

24    A.    Well, we couldn't see the sticker, one, and then

10:54:00 25    we -- we were able to make out the plate, but it wasn't

**Majid (Cross by Kucharski)**

1    clearly visible to us due to the cover and due to the salt

2    buildup.

3    Q.    Okay.  But you were able to read the plate from left

4    to right and run it prior to stopping the vehicle, correct?

10:54:19  5    A.    We were able to make out the plate and type in what we

6    assumed was the plate on our MDT.  And, like I said, we

7    still couldn't see the sticker because it was still being

8    covered by the cover.

9    Q.    Well, let's stop there.

10:54:33 10    Because when you got that information back on the car,

11    the information that you were getting back prior to the stop

12    matched the make and model of the car, correct?

13    A.    It matched -- it matched -- well, we don't -- when we

14    enter plates in our LEADS, it doesn't show models.  It just

10:54:55 15    shows what kind of make.

16    Q.    Okay.  Okay.  So everything was matching up until that

17    point in time, correct?

18    A.    All I had was a year and an Audi, yes.  I had a -- so

19    it was matching an Audi, yes.

10:55:02 20    Q.    Okay.

21    A.    And the color was matching, yes.

22    Q.    So there was nothing that had come up in LEADS up to

23    that point in time to say that something was amiss with that

24    vehicle, correct?

10:55:12 25    A.    No.

Majid (Cross by Kucharski)

35

1    Q.    All right.  Now, getting back to not seeing the

2    validation sticker, again, your job over the last five years

3    has been traffic enforcement, correct?

4    A.    Yes, that's correct.

10:55:30  5    Q.    So you're familiar that there is a separate ordinance

6    for the City of Cleveland for the validation sticker,

7    correct?

8    A.    If --

9    Q.    That's a separate violation from the license plate

10:55:46  10    obstructed?

11    A.    Okay.  And I'm not familiar with that code offhand.

12    Q.    And have you never cited that code?

13    A.    I don't recall if I did or not.

14    Q.    All right.  So with respect to the validation sticker,

10:55:59  15    you would agree that the validation sticker is a tiny little

16    square, correct?

17    A.    That's correct.

18    Q.    And it's probably maybe an inch or less in size?

19    A.    That's correct.

10:56:13  20    Q.    And typically, you wouldn't be able to read that

21    validation sticker unless you were up on top of the car,

22    correct?

23    A.    That is -- to read it, correct.

24    Q.    Okay.

10:56:25  25          MS. KUCHARSKI:  Now, if we can continue

**Majid (Cross by Kucharski)**

36

1    playing this.

2                       (Video played in open court.)

3                       MS. KUCHARSKI:  Stop -- I'm sorry.  Keep

4    going.

10:56:44  5         Stop there.

6    BY MS. KUCHARSKI:

7    Q.    This cigarette that Mr. Parks is smoking, it appears

8    to be a half smoked or almost finished cigarette.

9          You would agree with that?

10:56:55 10   A.    If you change the angle of the video, I just see -- I

11   just see the end of it.  I don't see anything else about it.

12   Q.    Okay.  Well, we'll let it keep playing.

13                       (Video played in open court.)

14   A.    Yes.

10:57:09 15   Q.    Okay.  And, again, as you approached the vehicle, you

16   didn't see him reach over and light a cigarette, correct?

17   A.    Correct.

18   Q.    Or pull a cigarette out?

19   A.    Correct.

10:57:22 20   Q.    Okay.

21                       MS. KUCHARSKI:  Keep playing.

22                       (Video played in open court.)

23                       MS. KUCHARSKI:  Stop there.

24   BY MS. KUCHARSKI:

10:57:32 25   Q.    Now, we just saw that his hands were sitting on his

**Majid (Cross by Kucharski)**

37

1    lap there, correct?

2    A.    Mm-hmm.

3    Q.    And, again, he didn't make any sudden movements with

4    his hands, correct?

10:57:42  5    A.    Correct.

6    Q.    Okay.

7                 MS. KUCHARSKI:  Keep playing.

8                    (Video played in open court.)

9                 MS. KUCHARSKI:  All right.  Stop.

10:57:49 10    BY MS. KUCHARSKI:

11    Q.    You asked him if he was valid?

12    A.    That's correct.

13    Q.    And it turns out that he was a valid and licensed

14    driver, correct?

10:57:58 15    A.    Correct.

16    Q.    Because if he wasn't, you would have given him a

17    ticket for that as well, correct?

18    A.    That's correct.

19    Q.    Okay.

10:58:06 20                 MS. KUCHARSKI:  Keep playing.

21                    (Video played in open court.)

22                 MS. KUCHARSKI:  Okay.  Stop.

23    BY MS. KUCHARSKI:

24    Q.    Okay.  So you ask him if there's anything in the car

10:58:16 25    that he needs -- that you need to know about.

1       Okay.  I'm sorry.  You ask him if there's anything

2   illegal in the car?

3   A.    That's correct.

4   Q.    Okay.  And -- or anything -- you say, is there

10:58:36  5   anything illegal in the car that I should know about.

6   A.    That's correct.

7   Q.    And then he says, Nothing I know about.

8   A.    I don't --

9            MS. KUCHARSKI:  Can you just back that up a

10:58:52  10   minute.

11            (Video played in open court.)

12            MS. KUCHARSKI:  Okay.  Back up further.  Like

13   around 55 would be good.  Okay.

14            (Video played in open court.)

10:59:16  15            MS. KUCHARSKI:  Okay.  Stop there.

16   BY MS. KUCHARSKI:

17   Q.    So you ask him who the vehicle belongs to as well,

18   correct?

19   A.    That's correct.

10:59:23  20   Q.    And he says -- he provides the name Sondra Hemphill,

21   correct?

22   A.    Yes.

23   Q.    And you have no reason to suspect that's not true

24   because that's what came up on the LEADS prior to the stop,

10:59:34  25   correct?

**Majid (Cross by Kucharski)**

1    A.     That's correct.

2    Q.     So he's being truthful with you up to this point in

3    time?

4    A.     Yes.

10:59:42  5    Q.     Okay.  And you ask him what his relationship is with

6    her, or he provides that it's his girlfriend, correct?

7    A.     Yes.

8    Q.     All right.

9                 MS. KUCHARSKI:  Keep playing.

10:59:52  10                 (Video played in open court.)

11                 MS. KUCHARSKI:  Okay.  Stop.

12    BY MS. KUCHARSKI:

13    Q.     So you ask him if he has anything illegal in the car

14    that he knows about.

10:59:59  15    A.     Yes.

16    Q.     Is that the question?

17    A.     Yes.

18    Q.     And he replies no.

19                 MS. KUCHARSKI:  We can let that play.

11:00:07  20            Play it, Phil.

21                 (Video played in open court.)

22                 MS. KUCHARSKI:  Okay.  So stop.

23    BY MS. KUCHARSKI:

24    Q.     So then you ask him about the odor of marijuana that

11:00:18  25    you smell, and he says that he smoked prior to getting in

**Majid (Cross by Kucharski)**

40

1    the car, correct?

2    A.    That's correct.

3    Q.    Now, again, up until this point in time, you haven't

4    observed any marijuana or drugs in plain view in the car,

11:00:31  5    correct?

6    A.    Correct.

7    Q.    You haven't observed any firearms in plain view in the

8    car, correct?

9    A.    Correct.

11:00:38 10    Q.    You didn't notice any bulge on Mr. Parks' person that

11    would indicate that there was a firearm on his person,

12    correct?

13    A.    That's correct.

14    Q.    Okay.

11:00:48 15         MS. KUCHARSKI:  Keep playing.

16              (Video played in open court.)

17         MS. KUCHARSKI:  Okay.  So I want to back up

18    about 10 seconds.

19              (Video played in open court.)

11:01:11 20         MS. KUCHARSKI:  Okay.  Stop.

21    BY MS. KUCHARSKI:

22    Q.    So at this point in time, you ask him to step out of

23    the vehicle, correct?

24    A.    That's correct.

11:01:16 25    Q.    And he starts to turn his body towards you, correct?

**Majid (Cross by Kucharski)**

1    A.    That's correct.

2    Q.    All right.  And, again, at this point in time, you

3    haven't observed a firearm, or there's been no indication

4    that he has a firearm, correct?

11:01:34   5    A.    That's correct.

6    Q.    And you previously testified on direct exam that there

7    was nothing before you asked him to step out of the car that

8    caused you concern for your safety, correct?

9    A.    Correct.

11:01:50  10    Q.    Okay.

11              MS. KUCHARSKI:  Keep playing.

12                 (Video played in open court.)

13              MS. KUCHARSKI:  Okay.  Stop it.

14    BY MS. KUCHARSKI:

11:02:06  15    Q.    So then you ask him about weapons, correct?

16    A.    Correct.

17    Q.    And you see his hesitation?

18    A.    Correct.

19    Q.    And that's when ultimately he tells you that he has a

11:02:21  20    weapon in the car, correct?

21    A.    Correct.

22    Q.    Now, going back to that statute, which is Defendant's

23    Exhibit D, there's nothing in that statute that says that

24    you have to be at least two car lengths behind a vehicle

11:02:56  25    before you can -- let me rephrase that.

**Majid (Cross by Kucharski)**

42

1          There's nothing in that statute that indicates any

2      type of distance that has to be met for an officer to be

3      able to read the plate, correct?

4      A.    As far as distance-wise, no.

11:03:20  5      Q.    Okay.  It just says in that statute that it has to be

6      readable in its entirety from left to right?

7      A.    That is correct.

8      Q.    Now, again, the whole reason that you were pulling the

9      car over was for the license plate obstructed, correct?

11:04:15  10      A.    Correct.

11      Q.    There wasn't any other reason that you were initiating

12      that traffic stop, correct?

13      A.    That's correct.

14      Q.    And you would agree that just because somebody smokes

11:04:31  15      marijuana doesn't mean that they're automatically going to

16      have a firearm on them, correct, or own a firearm?

17      A.    Can you repeat that question?

18      Q.    Just because somebody smokes marijuana doesn't

19      automatically mean that they're going to have a firearm,

11:04:43  20      correct?

21      A.    Automatically, yeah.  That's correct.  That's correct.

22      Q.    Okay.  Because there's lots of people who smoke

23      marijuana who don't even own firearms, correct?

24      A.    Yeah.  Yeah.  Correct.

11:05:02  25      Q.    And you would agree in the video that you had already

**Majid (Cross by Kucharski)**

43

```
            1   made the decision that you were going to ask Mr. Parks to

            2   step out of that vehicle before his conversation got

            3   animated?

            4   A.    Can you repeat that one more time for me?

11:05:27    5   Q.    Yeah.  I guess -- you know, what?  I'll just withdraw

            6   that question.

            7         I'll phrase it this way.

            8         There's a point in time on this video clip where

            9   Mr. Parks' demeanor changes; where he gets more excitable or

11:05:40   10   upset, I guess, for lack of a better word, and maybe you

           11   used the word, where he gets nervous.

           12         Would that be a fair --

           13   A.    Yes.  Correct.

           14   Q.    Okay.  You would agree that that doesn't happen until

11:05:54   15   you ask him to step out of the car, correct?

           16   A.    That's correct.

           17   Q.    And you had -- so you had already made the decision

           18   you were going to ask him to step out and pat him down

           19   before any of those indicators came into play, correct?

11:06:08   20   A.    Due to the smell of marijuana and him admitting,

           21   correct, yes.

           22   Q.    Okay.  So the only reason you were asking him to step

           23   out of the car to pat him down was an odor of marijuana?

           24   A.    And also -- and because he admitted to smoking it

11:06:26   25   before he got into the vehicle, correct.
```

1    Q.    Okay.  But it all relates to the marijuana, correct?

2    A.    That is correct, yes.

3    Q.    And just -- and you didn't know Mr. Parks, correct?

4    A.    No.

11:06:49  5    Q.    You didn't know Miss Hemphill, correct?

6    A.    No.

7    Q.    And smoking -- in the City of Cleveland, possession of

8    marijuana under 100 grams is a minor misdemeanor offense,

9    correct?

11:07:37  10    A.    That is correct.

11    Q.    So you won't even face any type of jail time, correct?

12    A.    Correct.

13    Q.    It just is a fineable offense for which you may have

14    to appear in court if you contest it?

11:07:51  15    A.    Under 100 grams, that's correct.

16              MS. KUCHARSKI:  Your Honor, if I could just

17    have a moment.

18                  (Pause in proceedings.)

19              THE COURT:  Go ahead.

11:08:11  20    BY MS. KUCHARSKI:

21    Q.    And I guess just for purposes of the record, I've

22    provided to you Defendant's Exhibits B and C.

23         Do you see those, officer?

24    A.    Oh, yeah.  Sorry.  Yes.  Yes.

11:08:26  25    Q.    And those are just screen shots from the body cam

1    footage, correct?

2    A.    That's correct.

3    Q.    That we've previously talked about?

4    A.    Correct.

11:08:35 5    Q.    And they relate to the LEADS information for that red

6    Audi and it belonging to Miss Hemphill, correct?

7    A.    That's correct.

8    Q.    Okay.

9              MS. KUCHARSKI:  Just one moment, Your Honor.

11:08:48 10              THE COURT:  Go ahead.

11              MS. KUCHARSKI:  Nothing further.

12              THE COURT:  Thank you.

13         Ms. Galvin.

14              MS. GALVIN:  Very briefly, Your Honor.

11:09:00 15              THE COURT:  All right.

16              REDIRECT EXAMINATION OF TREVOR MAJID

17    BY MS. GALVIN:

18    Q.    Officer, you were asked a series of questions about

19    your ability to read that plate from left to right.

11:09:20 20         Do you recall being asked those questions?

21    A.    Yes.

22    Q.    Now, you told us that essentially you were not able to

23    read that plate initially; is that correct?

24    A.    That's correct.

11:09:30 25    Q.    Okay.  You then told us at a point in time after you

1    were stopped behind the vehicle, you were able to, what you

2    believed, read the plate; is that correct?

3    A.    That's correct.

4    Q.    And you entered what you thought the letters and

11:09:44 5    numbers were for that plate into your MDT; is that correct?

6    A.    That's correct.

7    Q.    So it turns out you guessed right; is that correct?

8              MS. KUCHARSKI:  Objection, Your Honor.

9              THE COURT:  Sustained.

11:09:55 10             THE DEFENDANT:  That's correct.

11             THE COURT:  All right.

12   BY MS. GALVIN:

13   Q.    At what point in time were you able to confirm that

14   that was the plate that went with that vehicle?

11:10:06 15   A.    After we made contact with Mr. Parks, he verbally told

16   me that the vehicle belonged to his girlfriend, which was

17   the correct name, and also, I believe when we were going --

18   doing the inventory of the vehicle, we found the

19   registration card in there.

11:10:26 20   Q.    Okay.  Now, as it relates to the validation sticker,

21   at what point in time were you able to confirm that it is

22   that the validation sticker also matched with that car?

23   A.    When we had the vehicle stopped and when we were --

24   when we were physically, like, behind -- like, on foot

11:10:41 25   physically behind the vehicle, standing behind it.

**Majid (Redirect by Galvin)**

47

| | |
|---|---|
| 1 | Q.    And those validation stickers are color-coded, are |
| 2 | they not? |
| 3 | A.    They are color-coded. |
| 4 | Q.    What's the purpose of that? |
| 11:10:50  5 | A.    To know the year.  Every color has a -- it's because |
| 6 | of the year.  The year it expires. |
| 7 | Q.    So if you were able to see that the sticker was orange |
| 8 | and orange is from 2018, do you have some sort of automatic |
| 9 | indication about the validity of that license plate? |
| 11:11:08 10 | A.    That is correct. |
| 11 | Q.    Okay.  Now, when you were talking with the defendant, |
| 12 | you asked him if there was anything illegal in the car, and |
| 13 | we believe the answer may be something to the effect of, not |
| 14 | that I know about. |
| 11:11:23 15 | A.    That's correct. |
| 16 | Q.    Do you agree with that? |
| 17 | A.    Yes. |
| 18 | Q.    Now, we now know that that is not a truthful |
| 19 | statement, correct? |
| 11:11:31 20 | A.    That's correct. |
| 21 | Q.    Okay.  You were also asked about the defendant |
| 22 | admitting to you that he had used marijuana; is that |
| 23 | correct? |
| 24 | A.    That's correct. |
| 11:11:39 25 | Q.    In your training and experience and five years of |

1    making arrests, when an individual admits to you that you

2    they've only used weed, do you find that oftentimes to not

3    be truthful?

4    A.    That's correct, yes.

11:11:53  5    Q.    Okay.  And what drugs did you find on the defendant?

6    A.    We found -- for Mr. Parks we also found suspected

7    cocaine, to which later was tested positive.  It was

8    cocaine.

9    Q.    And have you found in your training and experience

11:12:15 10    that persons under the influence of marijuana can be

11    dangerous to you?

12    A.    That's correct.

13    Q.    Okay.

14              MS. GALVIN:  Thank you, Your Honor.  Nothing

11:12:25 15    further.

16              THE COURT:  Thank you, Ms. Galvin.

17         Ms. Kucharski, go ahead.

18              MS. KUCHARSKI:  Thank you, Your Honor.

19              RECROSS-EXAMINATION OF TREVOR MAJID

11:12:32 20    BY MS. KUCHARSKI:

21    Q.    Officer Majid, you weren't stopping the car because

22    you couldn't see the validation sticker, correct?

23    A.    We were stopping the vehicle due to the cover that was

24    on the license plate and making -- making the plate hard to

11:12:51 25    read from left to right.

**Majid (Recross by Kucharski)**

49

1    Q.    Okay.  The license plate obstructed?

2    A.    Correct.

3    Q.    And that's the ticket that you provided to Mr. Parks,

4    correct?

11:12:58  5    A.    Yes.

6    Q.    Now, again, Defendant's Exhibits B and C, you ran the

7    plate prior to stopping the car, correct?

8    A.    Right.  Correct.  Yes.

9    Q.    The car didn't come back as stolen, correct?

11:13:15 10    A.    That is -- at the time when we ran the -- when we

11    entered the plate into LEADS, correct.  At this time it was

12    not reported stolen, correct.

13    Q.    Right.  There was no information that you had at that

14    point in time that this car was in any way illegal, correct?

11:13:32 15    A.    Correct.  Other than the license plate obstruction

16    cover, correct.

17    Q.    And, again, you've read the statute regarding that,

18    correct?

19    A.    That is correct.

11:13:42 20    Q.    And you were able to enter all of the license plate in

21    order to pull up that information, correct?

22    A.    From what I believed -- correct.  Yes.

23    Q.    And the information that came up matched the vehicle,

24    correct?

11:13:56 25    A.    It matched a color, a make, and a year, correct.

1          MS. KUCHARSKI:  Nothing further, Your Honor.

2          THE COURT:  Thank you, Ms. Kucharski.

3     Officer, were you stopped or moving when you first

4     turned on your body cam?

11:14:15  5          THE WITNESS:  We -- when I first activated the

6     body cam, we were -- we were stopping the vehicle.  So we

7     were -- I had just stopped my car, put it in park, and

8     that's when I activated my body cam.

9          THE COURT:  Okay.  You saw no red light.

11:14:28  10     Where was the red light in relation to when you turned

11     on your body cam?

12          THE WITNESS:  It was -- so the body camera has

13     a 30-second buffer, so when the light turned green, we

14     started moving, and that's when I decided that that's where

11:14:39  15     we were going to stop the vehicle.  The --

16          THE COURT:  Back up for a second.

17     When you say "30 second buffer," what do you mean?

18          THE WITNESS:  So it automatically -- when we

19     turn on our body camera, it captures the 30 seconds before

11:14:51  20     of what was going on.

21     So if we activated our body camera right now, it would

22     capture 30 seconds before that.  Just video only.

23          THE COURT:  Okay.  So go ahead and finish your

24     answer.

11:15:03  25          THE WITNESS:  So after we decided that we were

1      going to stop the vehicle and the light turns green, and we

2      can get it safely off to the side of the road, that's when I

3      turn on my body camera.  So it activated the 30 seconds

4      before that.  So it activated -- it showed a video of me

11:15:12  5      passing the green light, underneath the green light, and

6      then it showed me getting out of the car and me tapping my

7      chest, my camera.

8                      THE COURT:  So when you activate it, it goes

9      back 30 seconds for the video?

11:15:23 10                      THE WITNESS:  That's correct, yes.

11                      THE COURT:  And that's why you're going

12      through the green light having been red before?

13                      THE WITNESS:  That's correct.

14                      THE COURT:  Got it.

11:15:31 15          Ms. Galvin, any questions based upon my questions?

16                      MS. GALVIN:  No, Your Honor.  Thank you.

17                      THE COURT:  Ms. Kucharski?

18                      MS. KUCHARSKI:  Can we play the first part of

19      that?

20          Stop there.

21          FURTHER RECROSS-EXAMINATION OF TREVOR MAJID

22      BY MS. KUCHARSKI:

23      Q.    It appears that your hand just activates the body cam

24      there, would that be correct?

11:16:00 25      A.    No, that's not correct.

         1              MS. KUCHARSKI:  Okay.  Then back up again to

         2      the beginning.

         3                   (Video played in open court.)

         4              MS. KUCHARSKI:  So stop.

11:16:11  5      BY MS. KUCHARSKI:

         6      Q.   So here, the car isn't moving, correct?

         7      A.   Right.  We were stopped -- we were stopped in traffic.

         8      Q.   Okay.  You're stopped in traffic, but you're not

         9      stopped at a red light, correct?

11:16:22 10      A.   No.  We were at a red light.

        11      Q.   Okay.

        12      A.   We were a couple car lengths behind.  We're not the

        13      first car at the red light or the second car, but we're in

        14      the -- we're in the lane.  Like we're waiting for the light

11:16:34 15      to turn green.  Like we're in traffic.

        16              MS. KUCHARSKI:  Okay.  Let it play.

        17                   (Video played in open court.)

        18      Q.   So you're saying here --

        19              MS. KUCHARSKI:  Stop it.

11:16:44 20      BY MS. KUCHARSKI:

        21      Q.   -- you're in a lane waiting for a light to turn?

        22      A.   It's a two-way -- it's a two-lane street.  So one

        23      going east -- it's one lane going east, one lane going west.

        24      Q.   Right.  But you're saying that just previous to this

11:16:57 25      before the car starts moving that you're waiting for the

             1    light to turn green?

             2    A.    That is correct.

             3              MS. KUCHARSKI:  Okay.  So play it.

             4              (Video played in open court.)

11:17:13     5              MS. KUCHARSKI:  Okay.  Now, I'm going to stop

             6    it here.

             7    BY MS. KUCHARSKI:

             8    Q.    From the point in time that you turn that body cam on

             9    to when you go under this green light, there's no streets

11:17:24    10    that come up on the right.

            11         Let me replay it for you.

            12              (Video played in open court.)

            13    BY MS. KUCHARSKI:

            14    Q.    So there's a street right there when you're going

11:17:56    15    under the light, correct?

            16    A.    That's correct.

            17    Q.    But you would agree that from the point in time you

            18    turn that body cam on until when you get up to the light,

            19    that there's no streets that come up on the right side of

11:18:07    20    the road, correct?

            21    A.    There's -- right there where we're at in this video,

            22    that's -- we're on Denison Avenue and we're at the

            23    intersection of West 47th Street, and that street, you can

            24    either go left right now or you can go right right now.

11:18:23    25    Q.    Right.  When you're right under the light, correct?

         1   A.    Right here, yes.

         2   Q.    Okay.  But prior to that --

         3   A.    Correct.

         4   Q.    -- there's no streets, correct?

11:18:31 5   A.    Correct.  Yeah.  The street -- the street that was

         6   behind us when we were sitting at the light was probably

         7   West 48th or West 49th.

         8   Q.    Okay.  So there's no cars that turn off in front of

         9   you, correct?

11:18:41 10  A.    No.  There was.  I just don't recall what cars or

        11   anything.  I just remember we were -- we were in traffic and

        12   we were waiting for the light to turn green to stop this

        13   vehicle.

        14   Q.    Well, if you look at the video clip --

11:18:53 15               THE COURT:  Hold on.  Officer, I think --

        16          Ms. Kucharski, if I may.

        17          You said there were cars in between you and the

        18   defendant to begin with.

        19               THE WITNESS:  That's correct.

11:19:03 20               THE COURT:  How did those cars get there?

        21               THE WITNESS:  Well, we were all -- we turned

        22   off a side street, and that -- I don't recall what side

        23   street that specifically was.  It could have been -- we were

        24   just in the general area.  So we probably -- maybe on West

11:19:14 25  50th Street.  I don't remember the exact side street.

Majid (Further Recross by Kucharski)                    55

1       So when we saw this car go by on Denison is when we

2   got behind -- we got into the lane of traffic, waited for

3   cars to move to go down different streets, and then at this

4   point, we were now directly behind the car waiting for the

11:19:29  5   light to turn green.

6                   THE COURT:  About how many cars were there

7   between --

8                   THE DEFENDANT:  I'd say at least two.

9                   THE COURT:  Ms. Kucharski, go ahead.

11:19:38 10   BY MS. KUCHARSKI:

11   Q.    You don't see any streets from the point in time that

12   you activate this body cam up until this light that come up

13   on the right-hand side of the road, correct?

14   A.    Just besides West 47th, correct.

11:19:49 15   Q.    Okay.  Which is with the one that's under the light,

16   correct?

17   A.    Yes.

18   Q.    All right.  And prior to the car moving, the patrol

19   car moving, you already have the information regarding the

11:20:00 20   Audi, correct?

21   A.    Yes.

22                   MS. GALVIN:  Objection.

23                   MS. KUCHARSKI:  Nothing further.

24                   THE COURT:  Okay.  Thank you.

11:20:08 25       All right.  I think that's all I have.  Officer,

1      thanks.  You can step down.

2                      THE WITNESS:  Thank you.

3                      THE COURT:  Ms. Galvin, that's it on behalf of

4      the Government?

11:20:31  5                      MS. GALVIN:  We have no other witnesses,

6      Your Honor.

7                      THE COURT:  Okay.  Ms. Kucharski?

8                      MS. KUCHARSKI:  No witnesses, Your Honor.

9                      THE COURT:  Okay.  What is counsel's desire?

11:20:38  10         Do you wish to simply oral argue now or give me short

11     post-hearing briefs?

12         Ms. Galvin, what do you prefer?

13                     MS. GALVIN:  Your Honor, I believe we're ready

14     to proceed now.  The Government, of course, has already

11:20:51  15     briefed the issue, as has Ms. Kucharski.

16                     THE COURT:  Ms. Kucharski?

17                     MS. KUCHARSKI:  That's correct, Your Honor.

18                     THE COURT:  Okay.  Ms. Galvin, go right ahead.

19                     MS. GALVIN:  Thank you, Your Honor.

11:20:57  20         Again, as the Government has already provided a brief

21     to the Court in response, I will not be very long in this.

22         I think the important point here in this matter,

23     Your Honor, is like most of these instances, the critical

24     portion, of course, is not on a body cam, as we might all

11:21:12  25     hope it would be, but these body cams are not designed to

1    capture something like that.  They are designed to capture

2    these encounters.

3    But from what the officer has told you, he saw a

4    vehicle with an obscured plate, not only in the tint, but in

11:21:25  5    the salt buildup of the plate itself and on a relatively

6    clean car that appeared -- that had been very washed very

7    recently.  Obviously, this is what caused him not be able to

8    read that plate.

9    It appears, Your Honor, that they were able to see it

11:21:41 10    and they were able to make the correct determination.  Of

11    course, they did not know that until they finally had the

12    vehicle pulled over, as the officer testified.

13    It was a red, it was an Audi, and it was a year.  But

14    that, in and of itself, does not mean that they have the

11:21:56 15    correct vehicle.  They still may conduct their

16    investigation.

17    They also were not able to see the validation sticker

18    with that tint and with that salt buildup as well.

19    By all accounts, Your Honor, this probably had the

11:22:09 20    initial appearance of a standard traffic stop.  But the odor

21    of marijuana is obviously what noticed -- was noticed by the

22    officer and it's something that he is entitled to pursue.

23    And as he certainly testified to, persons who are

24    under the influence of drugs, even marijuana, may be a

11:22:25 25    danger to the officer, particularly because marijuana may

1    not be the only thing that they have ingested.  Just because

2    they've told the officer it's marijuana doesn't mean it is,

3    in fact, only marijuana.

4        Again, as the officer tells you, as this traffic stop

11:22:40  5    keeps going on, it's really within less than about a minute

6    and 30 seconds where the defendant's demeanor certainly

7    starts changing now that he knows that he's being asked

8    about marijuana and he is going to be asked to step out of

9    the car.  All of those things are very apparent from the

11:22:55 10    video.

11        The difference in his demeanor, in addition to the

12    officer's testimony, that reasonably put him in the belief

13    that this person could be armed and dangerous or could be of

14    a danger to him.  So that would certainly entitle him to

11:23:09 15    conduct a pat down.

16        Furthermore, the defendant has admitted to smoking and

17    using marijuana, so the officer would be entitled to a

18    probable cause search of the vehicle as well.

19        Conducting a probable cause search of the vehicle, he

11:23:20 20    is not going to have the defendant remain inside of the

21    vehicle or even next to him at the vehicle when he was doing

22    that.

23        So certainly, it would be reasonable and prudent of

24    him to place that person in his patrol car and to conduct a

11:23:34 25    pat down before that as well, too.

1    So for all of those reasons, Your Honor, the

2    Government would ask this Court to deny the defendant's

3    motion.

4         THE COURT:  Thank you.

11:23:42  5    Ms. Kucharski, go ahead.

6         MS. KUCHARSKI:  Thank you, Your Honor.

7    Your Honor, it's our position that there was no

8    probable cause to initiate a traffic stop in this instance.

9    And I think that we do have the critical portion -- is

11:23:54  10    portrayed in the body cam, and the Court should carefully

11    consider that.

12    The statute in the City of Cleveland says that the

13    plate has to be readable from left to right.  Clearly, the

14    plate was readable, and we know that from the body cam.  We

11:24:09  15    know that from the still shots of the body cam, because the

16    officers were able to put that information in the system,

17    and they were able to get back the information that this

18    vehicle was an Audi.  And everything checked out from there.

19    The owner of the vehicle is the owner of the vehicle.

11:24:27  20    There was no reason, other than -- the license plate

21    obstructed was the reasoning of Officer Majid for the reason

22    for the stop.  It wasn't that he couldn't see the sticker.

23    His testimony was, he stopped the car because of the

24    license plate obstructed statute, and that's the ticket that

11:24:46  25    he provided ultimately to Mr. Parks as well.

1      But he's not allowed to stop a car when he's able to

2      read the plate and get the information back in the system.

3      But even assuming that the Court finds probable cause

4      for the stop, we then have to get past the officer's

11:25:09 5      request -- or it wasn't a request -- his order for Mr. Parks

6      to step out of the car and tell him that he was going to pat

7      him down.

8      There has to be some fear for the officer's safety at

9      that point in time.  And there's been no testimony

11:25:23 10      whatsoever that he was placed in any type of fear.

11      He, himself, said in his direct examination that there

12      was nothing before he asked him to step out that caused him

13      concern.  And that's key in this instance.  Because without

14      that, we don't have anything else.  We have an odor of

11:25:46 15      marijuana, and that's it.

16      We have no bulge that's being noted, no furtive

17      movements of Mr. Parks.  It's only at that point in time an

18      odor of marijuana, and nothing else, to cause the officer to

19      be concerned for his safety.

11:26:03 20      So for those reasons, Your Honor, we're asking that

21      the Court grant our suppression in its entirety and exclude

22      any evidence of a firearm and drugs.

23      Thank you.

24      THE COURT:  Ms. Kucharski, I do have a

11:26:14 25      question for you.

1          Assuming that you are correct that up to that point in

2     time when the officer said, Step out of the car, he had no

3     right to do so, assuming that, before Mr. Parks actually

4     stepped out, officer said, Do you have any weapons or

11:26:33  5     anything else I need to be concerned about, stop at that

6     point when he says yes.

7          Now, this is before Mr. Parks steps out of the

8     vehicle.

9               MS. KUCHARSKI:  Your Honor --

11:26:46 10               THE COURT:  Difference?

11               MS. KUCHARSKI:  Are you ready for me to

12     answer?

13               THE COURT:  Go ahead.

14               MS. KUCHARSKI:  At that point in time, he's

11:26:51 15     already ordered out of the car.

16               THE COURT:  I understand that.  I'm just

17     saying, he's not out of the car.  He hasn't made a move out

18     of the car.

19               MS. KUCHARSKI:  Correct.

11:27:01 20               THE COURT:  Okay.  But then the officer says,

21     Any weapons or anything else I need to be concerned about.

22          He answers yes.

23               MS. KUCHARSKI:  And I understand that, and I

24     guess my thought back to the Court would be, at that point

11:27:14 25     in time, if he's going to be asking him a question like that

1    when he's clearly in custody and ordered out of the car,

2    then he should have been read his *Miranda* warnings prior to

3    being asked that question.

4                    THE COURT:  Okay.  Heard and submitted.

11:27:30  5        You'll have my decision in a few days.  Thank you very

6    much, everyone.  We're adjourned.

7                    MS. KUCHARSKI:  Thank you, Your Honor.

8                    DEPUTY CLERK:  All rise.

9                    THE COURT:  And for the record, the exhibits

11:27:39 10   are admitted as evidence.

11                   DEPUTY CLERK:  This Court is now in recess.

12                   MS. GALVIN:  Your Honor, would you like a

13   physical exhibit, the video, a DVD marked as A?

14                   THE COURT:  We have that, don't we?

11:27:49 15                   MS. KUCHARSKI:  I submitted it.

16                   MS. GALVIN:  She submitted it, but would you

17   like a Government's A as well?

18                   THE COURT:  Please.

19                   MS. GALVIN:  Yes, Your Honor.  I'll get that

11:27:56 20   to you.

21                   THE COURT:  Thank you.

22                           -  -  -

23               (Proceedings adjourned at 11:33 a.m.)

24

25

1

**C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     */s/ Donnalee Cotone _____24th of November, 2019*
      DONNALEE COTONE, RMR, CRR, CRC                           DATE
7     Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25